Whalet, Judge,
delivered the opinion of the court:
The plaintiff on November 11,1932, entered into a contract with the defendant by which the plaintiff agreed to furnish all labor and materials and to perform all work to be required for the construction of a United States Post Office Building at Oak Park, Cook County, Illinois, for the sum of $349,500.00, according to the specifications, schedules, and drawings, which were made a part of the contract. This sum was reduced by certain changes to $347,251.00. Plaintiff furnished a performance bond with three individuals as sureties. This bond was approved and accepted by the defendant.
The building was to be completed within 420 days after the receipt of notice to proceed. On December 19, 1932, the plaintiff was instructed to begin work which fixed the final completion date as of February 13, 1934. The defendant furnished the site and was also to furnish 30 models for the carving to be done on the stones which were to be carved at the quarry. Each model had to be reproduced several times in order to secure all the carved stone for the building, and the carving was to be done in a careful and artistic manner *544 so as to reproduce the spirit and intent of the models. There were no exterior columns provided because the building was to be of a type known as “wall bearing.” The walls were to be of stone and designed in such a way as to permit them to bear the weight of steel girders supporting the floors and the roof. With this design it was impossible-to set in place the original steel beams, which supported the floors and the roof / or to pour the concrete slabs until the stone work had been carried up to the height required for the bearing plates.
At the commencement of the work, the plaintiff prepared a schedule of its-contemplated progress of each class of work and furnished a copy to the defendant and to its subcontractors. This schedule of progress was an essential part of the contract arrangement, expected cost, and amount of its bid. According to this progress schedule, the plaintiff would have been prepared to carve the stone in the early spring. In March, the contractor learned that there would be a delay on the part of the Government in furnishing models for the stone carving. The defendant was advised on the 29th of March 1933, that unless the model contract was awarded immediately there would be extensive delays to the building. The following month defendant’s engineer on the work notified the Treasury Department that the delay in furnishing the models was disturbing the progress of the work. - On repeated occasions the defendant was notified that its failure to comply with the terms of the contract to furnish these models for the stone carving was occasioning extensive delays.
In June 1933, the construction work was brought to the point where the carved stone was necessary for the walls. The first models were not received until October 3, 1933, and on October 31, 1933, the carved architrave stone was received and promptly set. It was not until the following April 1934, that the necessary carved stone was received. On January 23, 1934, the models for all the stone above the cornice were shipped by the modelers. The last carload of stone did not arrive until June 1, 1934. During this period of delay, the plaintiff endeavored to minimize the loss by doing miscellaneous work out of sequence and contrary to its *545 progress schedule. The roof slab, which was scheduled to have been poured during the month of September 1938, was not poured until January 1934. This necessitated work during the cold weather and plaintiff was put to an additional cost in supplying heat both night and day. However, it was impossible to perform the interior work, such as painting, glazing, interior marble, woodwork, and the laying of floors until the building was enclosed.
In February 1934, plaintiff requested an extension of 11 months, due to the failure of the Government to perform its part of the contract in furnishing the models for the carving of the stone. The defendant, in writing, admitted a delay of 9 months and extended the completion date for 270 days. A previous extension had been granted of 25 days, due to bad weather. Therefore, the final completion date was extended to December 4,1934.
Partial payments were provided for at the end of each calendar month as the work progressed, based on the estimates approved by the contracting officer. The contract provided that, if the contracting officer found that satisfactory progress was being made at any time after 50% of the work had been completed, the contractor should receive full payments without the deduction of the retained percentage. On March 30, 1934, the defendant admitted that over one-half of the work was completed; that plaintiff had been delayed by conditions beyond its control; that an extension of time of 295 days had been granted and at which time over 60% of the work had been completed and the work was “progressing satisfactorily.”
Although plaintiff had performed approximately $7,000 worth of work during the month of May, the Government engineer in charge refused to certify more than $600, basing his refusal on rumors and information, which he had personally solicited, that plaintiff owed certain amounts to his subcontractors and materialmen. On June 7, 1934, the defendant notified plaintiff by telegram that the contract was terminated on that day “due to unsatisfactory progress.”
The defendant took over plaintiff’s property on the site, including tools and appliances, none of which has been *546 returned. Upon tlie date of cancellation by the defendant, the building was 65% completed and plaintiff had consumed only 210 full-time calendar days of the original 420 days and over one-half of the work had been completed. At the time of cancellation the defendant had the percentage retained from each payment amounting to $21,805.80.
After the cancellation of the contract with the plaintiff, defendant entered into a contract with another party and the building was subsequently completed.
From the facts above cited, it is clearly apparent that the action of the Government in canceling the contract was arbitrary and capricious. Article 9 of the contract provides :
If the contractor refuses or fails to prosecute the work, or any separable part thereof, with such diligence as will insure its completion within the time specified in Article 1, or any extension thereof, or fails to complete said work within such time, the Government may, by written notice to the contractor, terminate his right to proceed with the work or such part of the work as to which there has been delay. * * *
It will be seen from this provision of the contract that there is no justification for the cancellation of the contract where it is shown that the contractor is prosecuting the work with diligence so as to insure its completion within the time allowed by the contract; plaintiff had performed over 60% of the work in 210 full-time calendar days, or one-half of the original time allowed in the contract; and when approximately 200 days remained of the extended time in which to complete the balance, or less than 40% of the construction work.
The entire fault for the delay was due to the failure of the defendant to comply with its part of the contract. The unreasonable and unwarranted failure to furnish the models for the carved stone was solely responsible for the building not being completed within the time limitations of the contract. The record shows that plaintiff’s contract was arbitrarily terminated in order to protect the Supervising Architect’s Office from censure from a political branch of *547 the Government, and to have the blame for the delay shifted from the shoulders of the Government to those of the contractor. The evidence clearly shows that, had defendant complied with its part of the contract, the building would have been completed on time. Whatever censure there may be, it cannot be imputed to the contractor.
It is too well established to require citation of authority that the Government can be required to make compensation to a contractor for damages which he has actually sustained by defendant’s default in its performance of its undertaking to him. United States v. Smith, 94 U. S. 214.
The cancellation of this contract being arbitrary and capricious, plaintiff is entitled to recover the damages sustained and proved as follows:
Maintenance of organization and sustained losses due to period of delay_$12, 968. 00
Overhead at office- 6, 719. 00
Cost of furnishing heat during cold weather_ 400.00
Enclosing building during cold weather_ 500. 00
Retained percentage on payments made to plaintiff_ 21, 805. 80
Work performed and materials used in construction in May- 6,905. 00
Value of tools and equipment, which had been taken over at time of cancelation of the contract_ 1, 000.00
Total_ 56, 799. 80
Plaintiff claims that the work would have been completed on time and that a profit would hai^e been made. Under the authorities plaintiff would have been entitled to whatever profit it could prove it would have made under the contract, but we do not think that the proof in this case shows that a profit would have been made. Therefore, this item is not allowable because of failure of proof.
We have not discussed the defenses made by the defendant as we feel that they do not merit serious consideration.
Plaintiff is entitled to recover the sum of $56,799.80. It is so ordered.
Williams, Judge; Littleton, Judge; Green, Judge; and Booth, Chief Justice, concur.